UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| PORFORIO MORALES, | ) | |
| Petitioner, | ) | |
| v. | ) | Civil Action No. 10-10013-JLT |
| HAROLD W. CLARKE, | ) | |
| Respondent. | ) | |

REPORT AND RECOMMENDATION
ON PETITION FOR WRIT OF HABEAS CORPUS

November 23, 2010

SOROKIN, MJ

Pending is the Petition for Writ of Habeas Corpus (Docket # 1) of the Petitioner, Porforio Morales. In response to an Order of Reference dated February 5, 2010 (Docket # 7), I RECOMMEND that the Petition be DENIED, for the following reasons.

I. FACTUAL AND PROCEDURAL BACKGROUND

Factual Background

The following factual information, which is recited in Commonwealth v. Morales, 453 Mass. 40 (2009), is presumed to be correct. See 28 U.S.C. § 2254(e)(1); Gunter v. Maloney, 291 F.3d 74, 76 (1st Cir.2002).

The Supreme Judicial Court determined that a jury could have found the following facts:[1] on July 4, 2004, Patrick Bullard was shot and killed.  He was a member of the Eastern Avenue gang in Springfield, Massachusetts.  Tameka Patterson, a daughter of Morales' girlfriend, Sheila Brady, was shot in the face during the same incident.  A friend of Patterson recognized the shooters as members of a rival gang known as the Gunn Square gang.  Patterson, her mother, and Morales lived together, and Morales talked of seeking revenge for Patterson's shooting.

On the evening of July 10, 2004, Marquis Nixon was at the home of Morales and Sheila Brady.  While outside on the porch, Morales asked Nixon for a ride to a store.  Nixon, who had plans to go to a party, reluctantly agreed after Morales said it would be "quick." Morales went inside, obtained a gun, and placed it in his waistband.  Leo White, who was in the house, saw this and followed Morales outside.  The three men entered Nixon's car.  Nixon drove, Morales sat in the front passenger seat, and White sat behind Morales.  They proceeded toward Gunn Square, near the corner of Northampton Avenue and Beverly Street.  Morales told Nixon to pull over, park past the corner of Northampton Avenue and Beverly Street, and turn off his headlights.  He left the engine running.  Morales and White got out of the car and walked toward a store at the corner of Beverly Street and Wilbraham Avenue.

In the meantime, nineteen-year-old Daylan Shepard and seventeen-year-old Travis Brown had been visiting a friend at his home on Massachusetts Avenue in Springfield.  At approximately 11:00 p.m., Shepard and Brown walked to the same store at the corner of Beverly Street and Wilbraham Avenue where Morales and White were headed.  After buying some

---

[1] The SJC's recitation of the facts is at Morales, 453 Mass. at 41-43.  Further facts will be adduced as appropriate to discussion of Morales's claims, infra.

snacks, they began to walk back. Brown saw two men standing at the far end of Beverly Street, but he could not make out their features because it was too dark. The two men he saw were Morales and Leo White. When Morales saw the two boys emerge from the corner store, he asked White if they were "the kids that shot" Bullard and Tameka Patterson the week before. White could not identify the two boys, and so told Morales. Morales nevertheless pulled out his gun and started shooting at the boys, who were at least twenty feet away.

Brown saw a flash and heard a shot coming from the direction of the two men. He and Shepard turned and ran. Brown then heard approximately six more shots. As they ran through some backyards, Shepard said that he had been shot. He collapsed behind a house on Northampton Avenue. Brown knocked on the back door of the house to try to get help, but no one answered. He then ran back to his friend's house and telephoned 911. Brown returned to the scene, where he saw Shepard being placed in an ambulance. Shepard died from a single gunshot wound to his left lower back.

Meanwhile, White and Morales had run back to the car where Nixon was waiting. Nixon had heard the shots. When Morales was inside the car, he said, "We got 'em." Nixon asked, "Who?" White replied, "The people that shot Pat." Nixon drove the two men back to Morales's house.

Police recovered nine spent shell casings in front of 7 and 9 Beverly Street, about sixty feet from its intersection with Wilbraham Avenue. The casings were all within approximately two and one-half feet of one another. Several projectiles were recovered from the inside of a building on Wilbraham Avenue, across from Beverly Street and the corner store. A projectile was found in a truck parked in front of the corner store, and projectile fragments were found in

front of the store. In mid-July, Morales sold a nine millimeter semiautomatic handgun to George Lovejoy. Lovejoy's cousin, Bridget Morris, was present during the sale. She kept the gun at her house in Springfield, and turned it over to Springfield police on October 27, 2004.

A Massachusetts State police ballistics expert determined that all of the recovered shell casings had been fired by the nine millimeter handgun recovered from Morris. He further determined that four of the spent projectiles that had been recovered were intact and could be compared to a projectile test-fired from the nine millimeter handgun. One was found outside of the building on Wilbraham Avenue; one was found inside of the same building; one was found inside of the truck parked in front of the corner store; and the fourth was recovered from Shepard's body at autopsy. The ballistician determined that all four of the projectiles had been fired from the nine millimeter handgun turned in by Morris.

Nixon and White testified at trial pursuant to written cooperation agreements. Nixon had been arrested on July 20, 2004, and indicted for illegal possession of a firearm (charges unrelated to the July 10, 2004, shooting). At that time, he gave a statement about the Shepard murder. He was not charged with Shepard's murder. White also was arrested on a charge of illegal possession of a firearm, in which Nixon was involved. White had been charged with the murder of Shepard and the assault with intent to murder Brown. Initially, he told police that Nixon and Morales had gotten out of the car, rather than Morales and himself.

Prior Proceedings

On October 20, 2004, Morales was indicted by a Hampden County grand jury on charges of: murder, in violation of M.G.L. c. 265, §1; assault with a dangerous weapon, in violation of M.G.L. c. 265, § 15B (b); armed assault with intent to murder, in violation of M.G.L. c. 265,

§18(b); and carrying a firearm without a license, in violation of M.G.L. c. 269, §19(a) & (d). See Docket # 11, Ex. A.

On March 31, 2006, a jury convicted Morales of all charges. Id. The trial judge (Ford, J.) sentenced Morales to life in prison for his conviction on the murder charge. He also sentenced him to concurrent terms of four-to-five years on the assault with a dangerous weapon charge, eighteen-to-twenty years on the armed assault with intent to murder charge, and four-to-five years on the charge of carrying a firearm without a license. Id. Morales filed a timely appeal. Id.

On December 8, 2006, Morales moved to stay his appeal and filed a motion for a new trial. See Id., Ex. F. The motion for a new trial was remanded to the Hampden County Superior Court and on December 27, 2006, the trial judge denied the motion without a hearing Id., Ex. A, C. On January 30, 2007, Morales appealed the denial of the motion for new trial. Id., Ex. A, F. On November 11, 2007, Morales filed a second motion for new trial which was also remanded to the trial court. Id., Ex. D, F. On December 4, 2007, the trial judge likewise denied Morales's second motion for new trial, and Morales also appealed that denial. Id. Ex. A, E.

In his appeal to the Supreme Judicial Court, Morales raised eight claims.[2] On January 9,

---

[2] The eight claims are:
1. whether the trial judge's denial of Morales' second motion for new trial was a reversible error (or, created a substantial likelihood of a miscarriage of justice) where:
    a. Morales was denied his right to effective assistance of counsel because trial counsel failed to elicit testimony from a witness that at the time of the crime Morales was intoxicated from ingesting alcohol and marijuana; or,
    b. Morales was denied his right to effective assistance of counsel where trial counsel failed to produce evidence that the same witness was dishonest;
2. a. whether the trial judge committed reversible error in allowing the Commonwealth's motion for reciprocal discovery;
    b. whether Morales was deprived of effective assistance of counsel by his trial counsel's failure to preserve that issue for appeal; or,

2009, the SJC affirmed Morales's convictions. Commonwealth v. Morales, 453 Mass. 40 (2009). On January 6, 2010, Morales filed the instant Petition for a Writ of Habeas Corpus raising two of the eight claims he asserted before the SJC. Docket # 1.

II.     DISCUSSION

Morales advances two claims in support of his Petition. First, he contends that allowing the Commonwealth's motion for reciprocal discovery pursuant to Commonwealth v. Durham, 446 Mass. 212 (2006), violated his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. Second, he contends that his right to effective assistance of counsel was violated by his trial counsel's failure to call two alibi witnesses.

Standard of Review Applicable to Habeas Petitions

Morales cannot obtain federal habeas relief under 28 U.S.C. § 2254(d)(1) unless he can show that the Massachusetts courts' decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." A legal

---

|     |     |     |
| --- | --- | --- |
|     | c.  | whether denial of the second motion for a new trial on bases 2(a) and 2(b), supra, was reversible error, or created a substantial risk of miscarriage of justice; |
| 3.  |     | whether Morales's first appellate counsel was ineffective in failing to preserve each of the issues delineated at (1) and (2), supra; |
| 4.  |     | whether it was reversible error for the trial judge not to give a missing witness instruction; |
| 5.  |     | whether trial counsel was ineffective in failing to present alibi defense; |
| 6.  |     | whether trial counsel was ineffective in failing to bring a sleeping juror to the attention of the Court; |
| 7   |     | whether the Court committed reversible error in instructing the jury on first degree murder by means of deliberate premeditation; and, |
| 8.  |     | whether the prosecutor's closing was inappropriate. |

Docket # 11, Ex. G.

principle is "clearly established" within the meaning of this provision only when it is embodied in a holding of the United States Supreme Court.  Thaler v. Haynes, 130 S.Ct. 1171 (2010) (citing Carey v. Musladin, 549 U.S. 70, 74 (2006); Williams v. Taylor, 529 U.S. 362, 412 (2000)).

The "contrary to" prong is satisfied when the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," Taylor, 529 U.S. at 405, or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result," Id. at 406.  The "unreasonable application" prong is satisfied if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  Moreover, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.

Reciprocal Discovery

Several additional facts bear upon Morales's claim that the trial court should not have allowed the Commonwealth's motion for reciprocal discovery.  At trial, Morales contended that two Commonwealth witnesses – Nixon and White – lied in pointing the finger at Morales so as to curry favor with the Commonwealth pursuant to their cooperation agreements.  See Morales, 453 Mass. at 44 ("Trial counsel aggressively impeached White with . . . his motives behind the cooperation agreement with the Commonwealth.  Counsel aggressively impeached Nixon in a similar manner).  Just before the beginning of the trial, the Commonwealth had also intended to

call a third witness pursuant to a cooperation agreement, Leo Lovejoy. Id. at 49. The prosecutor anticipated that Leo Lovejoy would testify (consistent with his August 31, 2004, statement to police) that: Lovejoy went to see Morales at Morales' home shortly after the shooting; Morales showed him (Lovejoy) the nine millimeter handgun Morales used to shoot at Shepard and Brown; Morales showed him a .25 caliber automatic handgun that jammed after one shot (but that Morales said nothing about who fired that gun); Morales asked Lovejoy to get some nine millimeter ammunition. Id. at 50. Lovejoy never stated that he purchased either gun from Morales. Id.

As a result of the trial judge's order allowing the motion for reciprocal discovery, trial counsel for Morales produced a recording of a phone call between Leo Lovejoy and Ana Williams, in which Leo Lovejoy admitted to fabricating his statements to police in order to secure a cooperation agreement from the Commonwealth. Id. at 49. Ultimately, the Commonwealth did not call Leo Lovejoy. Id. Morales attorney did not call Leo Lovejoy for at least two reasons – Lovejoy's counsel would not permit Morales's trial counsel to speak with him and Lovejoy's counsel reported that, if called, Lovejoy would assert his Fifth Amendment privilege. Docket # 11, Ex. B, Affidavit of Donald Frank at ¶ 13.

Now, Morales claims that requiring him to produce the reciprocal discovery caused the prosecutor to rethink calling Lovejoy and thus deprived Morales of an effective implied cross-examination of Nixon and White in violation of his constitution rights (i.e., that the evidence that Lovejoy lied in order to secure a cooperation agreement would enhance the credibility of the assertion that White and Nixon had likewise fabricated their testimony in order to secure their own cooperation agreements).

The SJC rejected Morales's claim. In doing so, it identified the many reasons the Commonwealth may have elected to decline to call Lovejoy, the most important of which was the prosecution's having secured a previously unavailable witness (Bridget Morris, who was present at the sale of the handgun and did not present Lovejoy's liabilities) subsequent to the hearing on the reciprocal discovery motion. Morales, 453 Mass. at 50-51. The only evidence supporting the conclusion that the reciprocal discovery caused a change of heart by the prosecution was the temporal proximity of the hearing and the prosecutor's decision. In light of all of the evidence, the SJC determined that that conclusion was speculative. Id. at 51.

Morales has failed to establish that the SJC's decision was contrary to or an unreasonable application of clearly established Supreme Court law. The Commonwealth did not call Lovejoy, thus there was no violation of Morales's right to cross-examine Leo Lovejoy. Morales has failed to establish by clear and convincing evidence that the SJC erroneously rejected the assertion that the reciprocal discovery order caused the Commonwealth's decision not to call Leo Lovejoy. Accordingly, I recommend that the Court reject this claim.

    B.    <u>Ineffective Assistance</u>.

Morales claims that his trial counsel was ineffective in failing to call two alibi witnesses. To succeed on a Sixth Amendment ineffective assistance of counsel claim, a habeas petitioner "must establish that (1) 'counsel's representation fell below an objective standard of reasonableness,' and (2) 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Smiley v. Maloney, 422 F.3d 17, 20 (1st Cir.2005) (quoting Strickland v. Washington, 466 U.S. 668, 689, 694 (1984)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466

U.S. at 694.  A failure of proof on either prong defeats an ineffective assistance of counsel claim. See Malone v. Clarke, 536 F.3d 54, 64 (1st Cir.2008) ("[I]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.") (internal quotation marks omitted).  The burden is on the Petitioner to demonstrate both deficient performance by his counsel and prejudice by a preponderance of the evidence.  See Lema v. United States, 987 F.2d 48, 51 (1st Cir.1993).

The Court's review of counsel's performance under the first prong of the Strickland test is highly deferential and a Petitioner must show that "given the facts known at the time, counsel's 'choice was so patently unreasonable that no competent attorney would have made it.'"  Knight v. Spencer, 447 F.3d 6, 15 (1st Cir.2006).  Counsel's tactical decisions cannot generally form a basis for an ineffective assistance of counsel claim. Murchu v. United States, 926 F.2d 50, 58 (1st Cir.1991) ("[T]actical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance.") (quoting United States v. Ortiz Oliveras, 717 F.2d 1, 3 (1st Cir.1983)).

The second prong of the Strickland test requires a Petitioner to demonstrate actual prejudice from the alleged mistakes of counsel.  Rice v. Hall, 564 F.3d 523, 525 (1st Cir.2009). The test applied to ineffective assistance claims in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), is the "functional equivalent" of Strickland for purposes of proceeding with a § 2254(d)(1) determination.  Mello v. DiPaulo, 295 F.3d 137, 144 (1st Cir.2002).  Of course, in order to prevail, Morales must not only prevail under the Strickland analysis, but also establish that the challenged state court decision was "contrary to" or an "unreasonable application" of Strickland.

Prior to trial, Morales's girlfriend Sheila Brady told Morales' trial counsel that she was with Morales at all relevant times throughout the evening of the shooting, with the exception of a ten minute shower in the afternoon. Id. at 45. Sheila Brady was very specific about Morales's activities, however, she could not recall what she (or Morales) did the day before or after the shooting. Docket # 11, Ex. B, Affidavit of Donald Frank at ¶ 3. Robert Brady, Sheila's brother, also informed trial counsel that Morales was with him at Sheila's home on the evening in question. Id. Brady was friendly with Nixon. See Trial Transcript, Vol. II, at 138. Trial counsel called neither of these two witnesses. He was concerned that Sheila Brady would have bolstered the Commonwealth's evidence of motive as it was her daughter who was shot one week earlier, an incident that Morales had vowed to avenge. Docket # 11, Ex. B, Affidavit of Donald Frank at ¶ 3. He was also concerned that the trial had gone well and he did not want to damage the case with a witness he thought was "not credible." Id. Morales contends that this constitutes ineffective assistance of counsel in that the alibi testimony would have supported the defense that White and Nixon lied by pointing the finger at Morales.

The trial judge rejected the claim finding that counsel was "vigorous and coherent, and . . . highly effective." Docket # 11, Ex. C. The SJC affirmed the trial judge and rejected this claim. Morales, 453 Mass at 46. Both Sheila and Robert Brady presented the problems as witnesses noted by defense counsel. While Robert Brady was friendly with Nixon, the jury might assume that, in deference to his sister, he would be biased in favor of her boyfriend, Morales. Finally, the SJC noted the absence of an affidavit from Morales asserting that he was, in fact, at Sheila Brady's home the entire evening.

The SJC's decision is neither contrary to, nor an unreasonable application of, clearly

established Supreme Court law. Morales has failed to establish that counsel's decision not to call Sheila or Robert Brady fell below an objective standard of reasonableness, or that (if it did) that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Finally, he has also failed to establish that the SJC's decision was "contrary to" or an "unreasonable application of" Strickland.[3]

III.   CONCLUSION

For the foregoing reasons, I recommend that the Court DENY the Petition for Habeas Corpus.[4]

/s/ Leo T. Sorokin
LEO T. SOROKIN
United States Magistrate Judge

---

[3] To the extent that Morales contends that the decision whether or not to call a witness rests with the defendant rather than trial counsel (See Docket # 2 at 30-31), there is no evidence before the Court that Morales instructed his trial counsel to call the witnesses.

[4] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation. The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).