UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PORFORIO MORALES, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Civil Action No. 10-10013-JLT |
| | * | |
| HAROLD W. CLARKE, | * | |
| | * | |
| Respondent. | * | |

MEMORANDUM

February 18, 2011

TAURO, J.

I. Introduction

On January 6, 2010, Porforio Morales ("Petitioner") petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This court entered judgment in favor of Respondent Harold W. Clarke ("Respondent") on January 3, 2011. Presently at issue is Petitioner's Request for Certificate of Appealability [#17], which was filed on January 18, 2011. For the following reasons, Petitioner's Motion is DENIED.

II. Background

    A. Factual Background

Under 28 U.S.C. § 2254(e)(1), the factual findings of a state court are presumed to be correct.[1] The Supreme Judicial Court of the Massachusetts ("SJC") presented the following facts

---

[1] Gunter v. Maloney, 291 F.3d 74, 76 (1st Cir. 2002) (citing Sanna v. DiPaolo, 265 F.3d 1, 7 (1st Cir. 2001)).

1

in Commonwealth v. Morales[2]:

> The jury could have found the following facts. On July 4, 2004, Patrick Bullard was shot and killed. He was a member of the Eastern Avenue gang in Springfield. Tameka Patterson, a daughter of [Petitioner's] girl friend, Sheila Brady, was shot in the face during the same incident. A friend of Patterson recognized the shooters as members of a rival gang known as the Gunn Square gang. Patterson, her mother, and [Petitioner] lived together, and [Petitioner] talked of seeking revenge for Patterson's shooting.
>
> On the evening of July 10, 2004, Marquis Nixon was at the home of [Petitioner] and Sheila Brady. While outside on the porch, [Petitioner] asked Nixon for a ride to a store. Nixon, who had plans to go to a party, reluctantly agreed after [Petitioner] said it would be "quick." [Petitioner] went inside, obtained a gun, and placed it in his waistband. Leo White, who was in the house, saw this and followed [Petitioner] outside. The three men entered Nixon's car. Nixon drove, [Petitioner] sat in the front passenger seat, and White sat behind [Petitioner]. They proceeded toward Gunn Square, near the corner of Northampton Avenue and Beverly Street. [Petitioner] told Nixon to pull over, park past the corner of Northampton Avenue and Beverly Street, and turn off his headlights. He left the engine running. [Petitioner] and White got out of the car and walked toward a store at the corner of Beverly Street and Wilbraham Avenue.
>
> In the meantime, nineteen year old Daylan Shepard and seventeen year old Travis Brown had been visiting a friend at his home on Massachusetts Avenue in Springfield. At approximately 11 P.M. Shepard and Brown walked to the same store at the corner of Beverly Street and Wilbraham Avenue where [Petitioner] and White were headed. After buying some snacks they began to walk back. Brown saw two men standing at the far end of Beverly Street, but he could not make out their features because it was too dark. The two men he saw were [Petitioner] and Leo White. When [Petitioner] saw the two boys emerge from the corner store, he asked White if they were "the kids that shot" Bullard and Tameka Patterson the week before. White could not identify the two boys, and so told [Petitioner]. [Petitioner] nevertheless pulled out his gun and started shooting at the boys, who were at least twenty feet away.
>
> Brown saw a flash and heard a shot coming from the direction of the two men. He and Shepard turned and ran. Brown then heard about six more shots. As they ran through some backyards Shepard said he had been shot. He collapsed behind a house on Northampton Avenue. Brown knocked on the back door of the house to try to get help, but no one answered. He then ran back to his friend's house and telephoned 911. Brown returned to the scene, where he saw Shepard being placed in an ambulance. Shepard died from a single gunshot wound to his left lower back.

---

[2] 453 Mass. 40 (2009).

Meanwhile White and [Petitioner] had run back to the car where Nixon was waiting. Nixon had heard the shots. When [Petitioner] was inside the car, he said, "We got 'em." Nixon asked, "Who?" White replied, "The people that shot Pat." Nixon drove the two men back to [Petitioner's] house.

Police recovered nine spent shell casings in front of 7 and 9 Beverly Street, about sixty feet from its intersection with Wilbraham Avenue. The casings were all within about two and one-half feet of each other. Several projectiles were recovered from inside a building on Wilbraham Avenue, across from Beverly Street and the corner store. A projectile was found in a truck parked in front of the corner store, and projectile fragments were found in front of the store. In mid-July [Petitioner] sold a nine millimeter semiautomatic handgun to George Lovejoy. Lovejoy's cousin, Bridget Morris, was present during the sale. She kept the gun at her house in Springfield, and turned it over to Springfield police on October 27, 2004.

A State police ballistics expert determined that all the recovered shell casings had been fired by the nine millimeter handgun recovered from Morris. He further determined that four spent projectiles that had been recovered were intact and could be compared to a projectile test-fired from the nine millimeter handgun. One was found outside the building on Wilbraham Avenue; one was found inside the same building; one was inside the truck parked in front of the corner store; and the fourth was recovered from Shepard's body at autopsy. The ballistician determined that all four projectiles had been fired from the nine millimeter handgun turned in by Morris.

Nixon and White testified at trial pursuant to written cooperation agreements. Nixon had been arrested on July 20, 2004, and indicted for illegal possession of a firearm unrelated to the July 10, 2004, shooting. At that time he gave a statement about the Shepard murder; he was not charged with Shepard's murder. White also was arrested on a charge of illegal possession of a firearm, in which Nixon was involved. White had been charged with the murder of Shepard and the assault with intent to murder Brown. Initially he told police that Nixon and [Petitioner] had gotten out of the car, rather than [Petitioner] and himself.[3]

B. Procedural Background

In 2004, a Hampden County grand jury indicted Petitioner for: (1) murder; (2) assault with a dangerous weapon; (3) armed assault with the intent to murder; and (4) unlawful possession of a firearm, second offense.[4]

---

[3] Id. at 41–43.

[4] Mem. Law Supp. Pet. Writ Habeas Corpus Pursuant 28 U.S.C. § 2254, 1 [#2].

3

Prior to the trial, Petitioner's girlfriend, Sheila Brady, told Petitioner's trial counsel that she was with Petitioner at all relevant times throughout the evening of the shooting, with the exception of a ten-minute shower in the afternoon.[5] Although Sheila was very specific about Petitioner's activities on the day of the shooting, she could not recall what she or Petitioner had done the day before or after the shooting.[6] Robert Brady, Sheila's brother, also informed trial counsel that Petitioner was with him at Sheila's home on the evening of the shooting.[7] Robert was friendly with Nixon.[8]

Ultimately, Petitioner's trial counsel called neither Sheila nor Robert.[9] Counsel explained that he did not call the Bradys for several reasons. First, he thought that their alibi testimony would have been weak.[10] Second, he was concerned that Sheila's testimony would have "bolstered the Commonwealth's evidence of [Petitioner's] motive, as it was her daughter, Tameka Patterson, who had been shot one week earlier by members of the Gunn Square gang, an incident that [Petitioner] vowed to avenge."[11] Third, he thought that Petitioner's case "'was as good as it was going to get, and [he] did not want to damage its strength by ending with a witness [he] felt

---

[5] Morales, 453 Mass. at 45.

[6] Report & Recommendation Pet. Writ Habeas Corpus, 11 [#12] [hereinafter Report & Recommendation].

[7] Morales, 453 Mass. at 45.

[8] Report & Recommendation, 11 [#12].

[9] Morales, 453 Mass. at 45.

[10] Id.

[11] Id.

4

was not credible.'"[12]

Also prior to the trial, in addition to Nixon and White, the Commonwealth had intended to call a third witness, Leo Lovejoy, pursuant to a cooperation agreement.[13] The Commonwealth anticipated that Lovejoy would testify in a manner consistent with his August 2004 statement to the police. In that statement, Lovejoy stated

> that he went to see [Petitioner] at his home shortly after the shooting. [Petitioner] showed him the nine millimeter handgun he used to shoot at Shepard and Brown. He also showed [Lovejoy] a .25 caliber automatic handgun that jammed after one shot, but he said nothing about who fired that gun. [Petitioner] asked [Lovejoy] to get some nine millimeter ammunition. [Lovejoy] never . . . purchased either gun from [Petitioner].[14]

After the trial judge allowed the Commonwealth's motion for reciprocal discovery, Petitioner's trial counsel produced a tape recording of a telephone conversation between Lovejoy and a woman named Ana Williams "in which Lovejoy boasted that he fabricated his statements to police concerning this case in order to secure a cooperation agreement with the Commonwealth."[15] The Commonwealth ultimately did not call Lovejoy to testify.[16]

On March 31, 2006, a jury convicted Petitioner of all charges.[17] The trial judge sentenced Petitioner to life in prison without the possibility of parole on the murder charge.[18] He also

---

[12] Id. (quoting an affidavit of Petitioner's trial counsel).

[13] See id. at 49.

[14] Id. at 50.

[15] Id. at 49.

[16] Id.

[17] Mem. Law Supp. Pet. Writ Habeas Corpus Pursuant 28 U.S.C. § 2254, 1 [#2].

[18] Mem. Law Supp. Pet. Writ Habeas Corpus Pursuant 28 U.S.C. § 2254, 1 [#2].

sentenced Petitioner to concurrent terms of four to five years on the assault with a dangerous weapon charge, eighteen to twenty years on the armed assault with intent to murder charge, and four to five years on the charge of carrying a firearm without a license.[19] Petitioner filed a timely appeal.[20]

In December 2006, Petitioner moved to stay his appeal and filed a motion for a new trial.[21] On December 27, 2006, the trial judge denied the motion without a hearing.[22] In January 2007, Petitioner appealed the denial of the motion for a new trial, and in November 2007, Petitioner filed a second motion for a new trial.[23] In December 2007, the trial judge denied Petitioner's second motion for a new trial, and Petitioner also appealed that denial.[24]

In January 2009, the SJC affirmed Petitioner's convictions.[25] On January 6, 2010, Petitioner filed a petition for writ of habeas corpus.[26] On November 23, 2010, Magistrate Judge Sorokin issued a Report and Recommendation on Petition for Writ of Habeas Corpus [#12], recommending that this court deny Petitioner's petition. On January 3, 2011, this court accepted

---

[19] Report & Recommendation, 5 [#12].

[20] Mem. Law Supp. Pet. Writ Habeas Corpus Pursuant 28 U.S.C. § 2254, 1 [#2].

[21] Report & Recommendation, 5 [#12].

[22] Report & Recommendation, 5 [#12].

[23] Report & Recommendation, 5 [#12].

[24] Report & Recommendation, 5 [#12].

[25] See Morales, 453 Mass. 40.

[26] Pet. Relief Conviction Sentence Person State Custody [#1].

6

and adopted Magistrate Judge Sorokin's Report and Recommendation.[27] On January 18, 2011, Petitioner filed the Request for Certificate of Appealability that is currently at issue.

III. Discussion

The standard for granting a certificate of appealability ("COA") is well established. Such relief should only be granted upon a "substantial showing" of a constitutional violation.[28] The definition of what constitutes a "substantial showing" is straightforward. If a district court has rejected the original petition on the merits, the "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[29]

After reviewing the record and the Petitioner's submissions, this court concludes that Petitioner fails to satisfy the abovementioned standard.

Petitioner seeks a COA on two grounds. First, Petitioner contends that the trial court violated Petitioner's Fifth, Sixth, and Fourteenth Amendment rights when it allowed the motion for reciprocal discovery pursuant to Commonwealth v. Durham.[30] In Durham, the SJC articulated a policy of liberal criminal discovery in Massachusetts that permits reciprocal discovery in criminal trials.[31] Here, Petitioner argues that the Commonwealth decided not to call Lovejoy to testify because of the recorded conversation that the Commonwealth obtained as a result of the

---

[27] Order [#15].

[28] Slack v. McDaniel, 529 U.S. 473, 483 (2000).

[29] Id. at 484.

[30] 446 Mass. 212 (2006).

[31] See id. at 222–24, 227–29.

7

reciprocal discovery order.[32] Petitioner argues that requiring him to produce reciprocal discovery deprived Petitioner of an effective implied cross-examination of Nixon and White in violation of Petitioner's rights.[33]

As the SJC explained in Morales, however, there are a number of reasons why the Commonwealth might have decided not to call Lovejoy to testify. Namely, Lovejoy's

> testimony would have been inconsistent in several respects with the testimony of White and Nixon, whose testimony already lacked consistency; the two-gun theory he would have introduced would have conflicted with the Commonwealth's one-gun theory; [Lovejoy] was yet another witness who would be testifying pursuant to a cooperation agreement; and defense counsel could have argued that . . . White ([Lovejoy's] brother), not [Petitioner], showed . . . Lovejoy the guns after the murder and that Lovejoy falsely put them in [Petitioner's] hands to protect White.[34]

The conclusion that the reciprocal discovery caused the prosecutor's decision not to call Lovejoy is supported only by "the timing of the prosecutor's decision not to call Lovejoy relative to the reciprocal discovery order."[35] The SJC determined that this conclusion was speculative.[36] In light of all the reasons that may have influenced the prosecutor not to have called Lovejoy, this court agrees. With regard to Petitioner's first argument, therefore, Petitioner has failed to make a "substantial showing" of a constitutional violation.[37]

---

[32] See Request Certificate Appealability, 2–3 [#17].

[33] Mem. Law Supp. Pet. Writ Habeas Corpus Pursuant 28 U.S.C. § 2254, 11 [#2] ("Lovejoy's testimony would have been inconsistent with the testimonies of [Nixon and White], both of whose testimonies also lacked consistency.").

[34] Morales, 453 Mass. at 50.

[35] Id.

[36] Id. at 51.

[37] See Slack, 529 U.S. at 483.

Second, Petitioner argues that the failure of his trial counsel to present an alibi defense deprived Petitioner of his right to effective assistance of counsel and his right to present a defense under the Sixth and Fourteenth Amendments.

To succeed on a Sixth Amendment ineffective assistance of counsel claim, a habeas petitioner must establish (1) that counsel's performance was deficient; and (2) that counsel's deficient performance prejudiced the defendant.[38] A court's review of trial counsel's performance is highly deferential. A petitioner must show that "given the facts known at the time, counsel's 'choice was so patently unreasonable that no competent attorney would have made it.'"[39] Trial counsel's "tactical decisions . . . cannot ordinarily form the basis of a claim of ineffective assistance."[40] Finally, failure on either prong defeats a petitioner's claim.[41]

Here, this court agrees with the trial judge, the SJC, and Magistrate Judge Sorokin that trial counsel's performance was not deficient.[42] The alibi defense that Petitioner claims that his trial counsel should have used relied on the testimony of Sheila and Robert Brady.[43] Petitioner's trial counsel had concerns about both Bradys as witnesses.[44] Moreover, whether to call a witness

---

[38] See Strickland v. Washington, 466 U.S. 668, 687 (1984).

[39] Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006).

[40] Murchu v. United States, 926 F.2d 50, 58 (1st Cir. 1991) (quoting United States v. Ortiz Oliveras, 717 F.2d 1, 3 (1st Cir. 1983)).

[41] See Malone v. Clarke, 536 F.3d 54, 64 (1st Cir. 2008).

[42] See Morales, 453 Mass. at 46; Report & Recommendation, 11 [#12].

[43] See Request Certificate Appealability, 4 [#17].

[44] See supra note 9–12 and accompanying text.

9

is a tactical decision,[45] and thus trial counsel's decision cannot constitute ineffective assistance of counsel unless it was "manifestly unreasonable."[46] This court finds that trial counsel's concerns regarding the Bradys were reasonable and thus his decision not to present an alibi defense did not constitute a deficient performance.

For these reasons, therefore, Petitioner has failed to make a "substantial showing" of a constitutional violation.[47]

IV.  Conclusion

Reasonable jurists would not find these issues debatable. For the foregoing reasons, this court finds no basis for granting a COA in the present case. The motion is DENIED.

IT IS SO ORDERED.

    /s/ Joseph L. Tauro
United States District Judge

---

[45] Commonwealth v. Britto, 433 Mass. 596, 602 (2001) (citing Commonwealth v. Adams, 374 Mass. 722, 728 (1978)).

[46] Id. (citing Commonwealth v. Martin, 427 Mass. 816, 822 (1998)).

[47] See Slack, 529 U.S. at 483.